IN THE SUPREME COURT OF NORTH CAROLINA

No. 115PA18

Filed 1 November 2019

INTERSAL, INC.

v.

SUSI H. HAMILTON, Secretary, North Carolina Department of Natural and Cultural Resources, in her official capacity; NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES; STATE OF NORTH CAROLINA; and FRIENDS OF QUEEN ANNE'S REVENGE, a Nonprofit Corporation

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an opinion and order entered on 13 October 2017 dismissing plaintiff's second amended complaint and an order entered on 4 May 2018 granting defendants' motion to dismiss plaintiff's appeal, both by Judge Gregory P. McGuire, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice under N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 15 May 2019 in session in the New Bern City Hall in the City of New Bern pursuant to section 18B.8 of Session Law 2017-57.

*Linck Harris Law Group, PLLC, by David H. Harris Jr., for plaintiff-appellant.*

*Joshua H. Stein, Attorney General, by Matthew W. Sawchak, Solicitor General, Ryan Y. Park, Deputy Solicitor General, Brian D. Rabinovitz, Special Deputy Attorney General, and Kenzie M. Rakes, Assistant Solicitor General, for defendant-appellees Susi H. Hamilton, North Carolina Department of Natural and Cultural Resources, and State of North Carolina.*

*Hedrick Gardner Kincheloe & Garofalo LLP, by Joshua D. Neighbors, for defendant-appellee Friends of Queen Anne's Revenge.*

HUDSON, Justice.

This case is before us pursuant to plaintiff's petition for writ of certiorari seeking review of the trial court's 13 October 2017 opinion and order dismissing plaintiff's second amended complaint. We allowed plaintiff's petition for writ of certiorari on 5 December 2018 and we now review whether "the trial court err[ed] in dismissing any or all of Plaintiff's claims for relief and Plaintiff's Second Amended Complaint under N.C. R. Civ. P. 12(b)(1), (2), (6), or other reasons stated in the order." Accordingly, we affirm in part, reverse in part, and remand to the trial court because we conclude that it: (1) correctly granted the State Defendants'[1] motion to dismiss plaintiff's claims for breach of the 1998 Agreement; (2) correctly granted the motion filed by Friends of the Queen Anne's Revenge (FoQAR) to dismiss plaintiff's tortious interference with contract claim; (3) erred in granting the State Defendants' motion to dismiss plaintiff's claim that the State Defendants breached the 2013 Settlement Agreement by violating plaintiff's media and promotional rights; and (4) erred in granting the State Defendants' motion to dismiss plaintiff's claim that DNCR breached the 2013 Settlement Agreement by failing to renew plaintiff's *El Salvador* search permit.

Factual and Procedural Background

---

[1] This opinion will—as the trial court did below—use the name "the State Defendants" to refer collectively to defendants (1) Susi H. Hamilton, Secretary of the North Carolina Department of Natural and Cultural Resources; (2) the North Carolina Department of Natural and Cultural Resources (DNCR); and (3) the State of North Carolina.

The facts of this case begin with, and are now woven into, the tales of two ships (1) *Queen Anne's Revenge* (*QAR*) and (2) *El Salvador*.[2] *QAR* is believed to be the flagship of pirate Blackbeard and was reported lost in 1718. *El Salvador* was a privately owned merchant vessel that was reported lost at sea, off the coast near Cape Lookout, North Carolina, during a storm in 1750.

In 1994, centuries after the disappearances of these two ships, plaintiff Intersal, Inc., a marine research and recovery corporation, received permits from the North Carolina Department of Natural and Cultural Resources (DNCR) to search for *QAR* and *El Salvador* in Beaufort Inlet in Carteret County. On 21 November 1996, plaintiff discovered *QAR* just over a mile off Bogue Banks.

After discovering *QAR*, plaintiff entered into an agreement with DNCR on 1 September 1998 (1998 Agreement). As part of the agreement, plaintiff agreed to forgo its entitlement to any share in "coins and precious metals" recovered from *QAR*. The ultimate disposition of all artifacts from *QAR* was a matter left to DNCR.

In return for plaintiff forgoing its rights to the artifacts from *QAR*, DNCR recognized plaintiff as a partner in all aspects of the "*QAR* Project." The 1998 Agreement defined the *QAR* Project as "all survey, documentation, recovery, preservation, conservation, interpretation and exhibition activities related to any

---

[2] This factual background is a summary of the allegations contained in plaintiff's second amended complaint. When reviewing a trial court's decision on a motion to dismiss pursuant to N.C. R. Civ. P. 12(b)(6), we treat the allegations contained in the complaint as true. *See CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016) (quoting *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013)).

portion of the shipwreck of QAR or its artifacts." Accordingly, plaintiff also obtained the following rights: (1) "the exclusive right to make and market all commercial narrative (written, film, CD Rom, and/or video) accounts of project related activities undertaken by the Parties"; (2) the reasonable cooperation of "[a]ll Parties . . . in the making of a film and/or video documentary . . . with regard to project activities"; (3) "reasonable access and usage, subject to actual costs of duplication, of all video and/or film footage generated in the making" of "a non commercial educational video and/or documentary" that "[a]ll Parties agree[d] to cooperate in [ ] making"; and (4) "exclusive rights to make (or have made) molds or otherwise reproduce (or have reproduced) any QAR artifacts of its choosing for the purpose of marketing exact or miniature replicas" subject to "standard museum practices," approval by the project's "Advisory Committee," and the requirement that the replicas "be made on a limited edition basis" and authenticated by individual numbering or some other means.

In addition, the 1998 Agreement provided that:

> Subject to the provisions of Article 3 of Chapter 121 of the General Statues of North Carolina and subchapter .04R of Title 7 of the North Carolina Administrative Code, [DNCR] agrees to recognize [plaintiff's] . . . efforts and participation in the QAR project as sufficient to satisfy any performance requirements associated with annual renewal of [plaintiff's] permits for [ ] *El Salvador* . . . for the life of this Agreement, renewal of said permits cannot be denied without just cause.

Plaintiff alleges that in 2013, DNCR breached the 1998 Agreement in a number of ways. First, plaintiff alleges that DNCR failed to recognize plaintiff's

renewal of the 1998 Agreement. Plaintiff alleges that it validly executed its option to renew the 1998 Agreement via letters sent on 28 October 2012 and 4 December 2012.

Second, plaintiff alleges that certain DNCR employees, who had the responsibility of overseeing the *QAR* Project, violated the 1998 Agreement's conflict of interest provisions—and its provisions granting plaintiff exclusive commercial media rights—by serving on the board of the nonprofit corporation FoQAR. Specifically, plaintiff alleges that the DNCR employees, serving in their roles as board members of FoQAR, contracted with an independent media company to produce videos and a website covering the *QAR* Project. Allegedly, the execution of this contract included a ten thousand dollar payment from FoQAR to the spouse of FoQAR's treasurer, and that payment was not reported on FoQAR's 2013 Form 990. FoQAR's treasurer was also a DNCR employee who oversaw the *QAR* Project. Plaintiff alleges that these actions also constituted tortious interference with contract by FoQAR. FoQAR filed Articles of Dissolution on 14 March 2016. However, this action continues under N.C.G.S. § 55A-14-06(b)(5) (2017).

Third, plaintiff alleges that DNCR breached the 1998 Agreement by obstructing and delaying the renewal of plaintiff's permit, which authorized it to search for *El Salvador*. Plaintiff also alleges that this obstruction of renewal of its permit implicates the 1998 Agreement's conflict of interest provisions because the DNCR employees who obstructed and delayed the renewal of its permit were also board members of FoQAR.

On 26 July 2013, plaintiff filed a petition for a contested case hearing with the Office of Administrative Hearings (the OAH) seeking a remedy for State Defendant's alleged violations of the 1998 Agreement and of plaintiff's intellectual property rights. Following that filing, plaintiff's *El Salvador* permit was renewed on 9 August 2013. Thereafter, the OAH ordered mediation in the matter and, as a result of the mediation, plaintiff, DNCR, and plaintiff's long-time "*QAR* Video Designee," Nautilus Productions, LLC (Nautilus), entered into a settlement agreement on 15 October 2013 (2013 Settlement Agreement).

The parties expressly agreed that the 2013 Settlement Agreement would supersede the 1998 Agreement. Further, plaintiff and DNCR agreed to release each other from all claims that they could have asserted under the 1998 Agreement. Plaintiff also agreed to withdraw its petition for a contested case hearing within five business days of the execution of the agreement. Moreover, the agreement stated that, in the event of breach, the parties could "avail themselves of all remedies provided by law or equity."

Under the 2013 Settlement Agreement, the parties agreed that DNCR would "establish and maintain access to a website for the issuance of Media and Access Passes to *QAR*-project related artifacts and activities." The website would include, in pertinent part: (1) plaintiff's terms of use agreement, and (2) links to the websites of DNCR, plaintiff, and Nautilus. Further, the parties agreed that, regardless of the entity that produced the media,

[a]ll non-commercial digital media . . . shall bear a time code stamp, and watermark (or bug) of Nautilus and/or D[N]CR, as well as a link to D[N]CR, [plaintiff], and Nautilus websites, to be clearly and visibly displayed at the bottom of any web page on which the digital media is being displayed.

Moreover, DNCR agreed "to display non-commercial digital media only on D[N]CR's website."

Further, with regard to plaintiff's *El Salvador* permit, the 2013 Settlement Agreement provided that:

In consideration for [plaintiff's] significant contributions toward the discovery of the QAR and continued cooperation and participation in the recovery, conservation, and promotion of the QAR, D[N]CR agrees to continue to issue to [plaintiff] an exploration and recovery permit for the shipwreck *El Salvador* in the search area defined in the current permit dated 9 August 2013. D[N]CR agrees to continue to issue the permit through the year in which the QAR archaeology recovery phase is declared complete so long as the requirements contained in the permit are fulfilled. . . . D[N]CR agrees to recognize [plaintiff's] efforts and participation in the QAR project as sufficient to satisfy any performance requirements associated with annual renewal of [plaintiff's] permit for the *El Salvador*.

Plaintiff alleges that DNCR later breached the 2013 Settlement Agreement by: (1) displaying over two thousand *QAR* digital media images and over two hundred minutes of *QAR* digital media video on websites other than DNCR's website; (2) displaying those images without a watermark, time code stamp, or website links; (3) continuing to obstruct and delay the renewal of plaintiff's permit to search for *El Salvador*; (4) failing to implement certain mandates of the 2013 Settlement

Agreement, such as changes to the *QAR* Project media policy; (5) failing to properly inform certain groups of opportunities under the collaborative commercial narrative opportunity and/or media procedure language of the 2013 Settlement Agreement; (6) allowing FoQAR to film QAR recovery operations through an independent media company; (7) allowing FoQAR to post the footage that it filmed on the FoQAR Facebook page without a time code stamp, watermark, or website link; and (8) allowing FoQAR to bring the crew of a local radio show to dive the *QAR* shipwreck and shoot footage aboard the recovery vessel. Plaintiff also contends that FoQAR tortiously interfered with plaintiff's contract rights by filming the *QAR* recovery efforts and placing the footage on its website, while FoQAR was aware of the 2013 Settlement Agreement.

On 2 March 2015, plaintiff filed a second petition for a contested case hearing with the OAH. DNCR moved to dismiss plaintiff's petition, arguing that the OAH lacked subject matter jurisdiction to hear contractual claims that were not raised in plaintiff's earlier contested case hearing petition. Plaintiff dismissed its second petition for a contested case hearing without prejudice on 26 May 2015.

On 3 November 2015, plaintiff received a notice of termination for its permit to search for the *El Salvador* even though it already requested renewal of the permit. However, on 5 November 2015, plaintiff received another notice from the Attorney General's Office stating that DNCR had received plaintiff's request for renewal of the permit, that the notice of termination was rescinded, and that it would take thirty

days to review plaintiff's renewal request. In those thirty days, State Defendants, for the first time, solicited an opinion from counsel for the Kingdom of Spain as to whether State Defendants could issue a permit to search for *El Salvador*. On 30 November 2015, counsel for the Kingdom of Spain issued an opinion that State Defendants could not grant a permit to search for *El Salvador* without the Kingdom of Spain's permission. Plaintiff received notice that its request for review of the *El Salvador* permit was denied. The notice stated that plaintiff's permit was being terminated because (1) plaintiff "failed to demonstrate operational control of laboratory activities and failed to meet certain reporting requirements"; and (2) the issuance of further permits was "not deemed to be in the best interest of the State" because "Spain's assertion of its ownership interest in *El Salvador* requires careful consideration of the State's legal authority to issue a permit in this situation." Plaintiff alleges that *El Salvador* was a private merchant vessel and, therefore, the Kingdom of Spain has no legitimate claim to it.

Plaintiff sought review of the decision to terminate its permit, and on 21 January 2016, DNCR issued a final agency decision upholding the denial of the *El Salvador* permit. Thereafter, plaintiff filed a petition for a contested case with the OAH seeking review of DNCR's final agency decision. Plaintiff's contested case was dismissed on 27 May 2016. Plaintiff then sought review in Superior Court, Wake County.

On 27 July 2015, plaintiff separately filed a complaint in Superior Court, Wake

County, asserting claims against the State Defendants for breach of contract, and requesting that the trial court enter a declaratory judgment, a temporary restraining order, a preliminary injunction, and a permanent injunction. The case was designated a mandatory complex business case on 10 September 2015. However, on 4 May 2016, this case was stayed by the trial court pending the resolution of plaintiff's administrative appeal.

With regard to plaintiff's administrative appeal, plaintiff filed its petition for judicial review of the OAH's decision to dismiss its contested case on 23 June 2016. Pursuant to judicial review, the trial court entered an order upholding the OAH decision, granting summary judgment in favor of the State Defendants, and denying and dismissing plaintiff's petition for judicial review because

> the Kingdom of Spain has a sufficient likelihood of success in its claim of ownership of the consigned cargo of the *El Salvador*, and that a reasonably cautious and prudent steward of the State's resources, in a good faith exercise of discretion, could conclude that the issuance of the [*El Salvador*] permit to the Petitioner was no longer in the best interest of the State.

Following its first order, the trial court granted plaintiff's motion for leave of court to file a second amended complaint on 20 February 2017. Plaintiff's second amended complaint was also deemed to be filed on that date. In the second amended complaint, plaintiff asserted the following pertinent claims: (1) breach of contract claims against the State Defendants for violating the terms of the 1998 Agreement,

for violating plaintiff's media and promotional rights under the 2013 Settlement Agreement, and for refusing to renew plaintiff's *El Salvador* permit as required by the 2013 Settlement Agreement; and (2) tortious interference with plaintiff's contractual rights under the 1998 Agreement and the 2013 Settlement Agreement against FoQAR. Both State Defendants and FoQAR moved to dismiss plaintiff's second amended complaint.

On 13 October 2017, the trial court, in pertinent part, dismissed the following with prejudice: (1) plaintiff's breach of contract claims against the State Defendants under the 1998 Agreement; (2) plaintiff's claim that FoQAR tortiously interfered with plaintiff's contractual rights under both the 1998 Agreement and the 2013 Settlement Agreement; and (3) plaintiff's breach of contract claim against the State Defendants under the 2013 Settlement Agreement stemming from the State Defendants' refusal to renew plaintiff's *El Salvador* permit. It also dismissed without prejudice plaintiff's breach of contract claim against the State Defendants under the 2013 Settlement Agreement stemming from DNCR's alleged violations of plaintiff's media and promotional rights.

On 9 November 2017, plaintiff filed a notice of appeal from the trial court's decision; however, that notice of appeal named the Court of Appeals, not this Court, as the judicial body to which plaintiff had a statutory right of appeal. *See* N.C.G.S. § 7A-27(a)(2) (2017). Accordingly, on 10 April 2018, the State Defendants filed a motion to dismiss the appeal. Before the State Defendants filed their motion to dismiss the

appeal, plaintiff filed a petition for writ of certiorari to this Court seeking review of the trial court's 13 October 2017 opinion and order dismissing its second amended complaint. The trial court dismissed plaintiff's appeal on 4 May 2018. We, however, allowed the petition for writ of certiorari on 5 December 2018. Pursuant to plaintiff's certiorari petition, we now review whether the trial court erred in dismissing plaintiff's second amended complaint to the extent summarized above.

Analysis

We conclude that the trial court properly dismissed plaintiff's claims against the State Defendants for breach of the 1998 Agreement and its claim against FoQAR for tortious interference with contract. However, we also conclude that the trial court erred in dismissing plaintiff's claims for (1) breach of the 2013 Settlement Agreement stemming from DNCR's alleged violations of plaintiff's media and promotional rights; and (2) breach of the 2013 Agreement stemming from DNCR's non-renewal of plaintiff's *El Salvador* permit. Accordingly, we affirm in part, reverse in part, and remand to the trial court.

A. Standard of Review

This Court reviews de novo the grant of a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *See CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016) (citations omitted). "In considering a motion to dismiss under Rule 12(b)(6), the Court must decide 'whether the allegations of the complaint, if treated as true, are sufficient to

state a claim upon which relief can be granted under some legal theory.' " *Id.* (quoting *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013)). Dismissal of a claim under Rule 12(b)(6) is proper when one or more of the following is satisfied: "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact[s] sufficient to make a [ ] claim; (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. Jag, Inc.,* 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985) (citing *Forbis v. Honeycutt*, 301 N.C. 699, 701, 273 S.E.2d 240, 241 (1981)) (other citation omitted). However, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle [the plaintiff] to relief." *Sutton v. Duke*, 277 N.C. 94, 102, 176 S.E.2d 161, 165–66 (1970) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80, 84 (1957), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561–63, 127 S. Ct. 1955, 1968–69, 167 L. Ed. 2d 929, 943–44 (2007)).

This Court also reviews a dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure de novo and it may consider matters outside of the pleadings. *Harris v. Matthews*, 361 N.C. 265, 271, 643 S.E.2d 566, 570 (2007) (citations omitted).

B. Breach of Contract: The 1998 Agreement

The trial court dismissed plaintiff's breach of contract claims against the State Defendants under the 1998 Agreement because it concluded that "the 2013

Settlement Agreement was a novation of the 1998 Agreement and that Plaintiff's rights under the 1998 Agreement have been extinguished." We affirm.

"A novation is the substitution of a new contract for an old one which is thereby extinguished." *Carolina Equip. & Parts Co. v. Anders*, 265 N.C. 393, 400, 144 S.E.2d 252, 257 (1965) (citing *Tomberlin v. Long*, 250 N.C. 640, 109 S.E.2d 365 (1959)). "The essential requisites of a novation are a previous valid obligation, the agreement of all the parties to the new contract, the extinguishment of the old contract, and the validity of the new contract." *Tomberlin*, 250 N.C. at 644, 109 S.E.2d at 367–68 (citation omitted). Further, in determining whether a later contract is a novation of a prior contract,

> [t]he intent of the parties governs. . . . If the parties do not say whether a new contract is being made, the courts will look to the words of the contracts, and the surrounding circumstances, if the words do not make it clear, to determine whether the second contract supersedes the first. If the second contract deals with the subject matter of the first so comprehensively as to be complete within itself or if the two contracts are so inconsistent that the two cannot stand together a novation occurs.

*Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 526, 379 S.E.2d 824, 827 (1989) (citing *Wilson v. McClenny*, 262 N.C. 121, 136 S.E.2d 569 (1964); *Tomberlin*, 250 N.C. at 644, 109 S.E.2d at 367–68; *Turner v. Turner*, 242 N.C. 533, 89 S.E.2d 245 (1955); *Bank v. Supply Co.*, 226 N.C. 416, 38 S.E.2d 503 (1946)).

Here, neither plaintiff nor the State Defendants have argued before this Court

that either the 1998 Agreement or the 2013 Settlement Agreement are invalid.[3] Further, plaintiff and the State Defendants both agreed to the 2013 Settlement. Therefore, if the parties intended the 2013 Settlement Agreement to be a novation of the 1998 Agreement, it extinguished the 1998 Agreement. *See Tomberlin,* 250 N.C. at 644, 109 S.E.2d at 367–68; *Whittaker Gen. Med. Corp.*, 324 N.C. at 526, 379 S.E.2d at 827.

The words of the 2013 Settlement Agreement themselves "make it clear . . . the second contract supersedes the first." *Whittaker Gen. Med. Corp.*, 324 N.C. at 526, 379 S.E.2d at 827. Specifically, the 2013 Settlement Agreement states that it "supersedes the 1998 Agreement, *attached as **Attachment A**, and all prior agreements between D[N]CR, [plaintiff], and Nautilus regarding the *QAR* project." (emphases added). Because the language of the 2013 Settlement Agreement so clearly demonstrates the parties' intent that it would function as a novation of the 1998 Agreement, our analysis can end with the plain wording of the agreement. *See Whittaker Gen. Med. Corp.*, 324 N.C. at 526, 379 S.E.2d at 827 (stating that a court will look to the circumstances surrounding the second agreement to determine whether it is a novation "*if the words [of the agreement] do not make it clear*" (emphasis added))).

---

[3] In its brief, plaintiff points to the State Defendants' second affirmative defense in their answer to plaintiff's original complaint, in which the State Defendants appear to have asserted that certain paragraphs of the 1998 Agreement and the 2013 Settlement Agreement are unenforceable because they are against public policy. However, plaintiff does not actually argue that either agreement is invalid, and neither do the State Defendants.

Because the 2013 Settlement Agreement was a novation of the 1998 Agreement, plaintiff's breach of contract claims arising from the 1998 Agreement are "extinguished." *See Carolina Equip. & Parts Co.*, 265 N.C. at 400, 144 S.E.2d at 257 (citing *Tomberlin*, 250 N.C. at 644, 109 S.E.2d at 367).

Accordingly, we affirm the decision of the trial court to dismiss plaintiff's breach of contract claims under the 1998 Agreement.

C. Tortious Interference

The trial court dismissed plaintiff's tortious interference with contract claim against FoQAR under the 1998 Agreement and the 2013 Settlement Agreement because

> [m]ere allegations that DNCR employees also served as members of F[o]QAR's board of directors, or that DNCR permitted F[o]QAR to film recovery operations and post videos to its website or to dive the *QAR* wreck do not amount to allegations of purposeful conduct on the part of F[o]QAR that was intended to induce DNCR to breach any contracts.

We affirm.

A claim for tortious interference with contract has the following elements:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC,* 368 N.C.

693, 700, 784 S.E.2d 457, 462 (2016) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

The first theory by which plaintiff asserts that FoQAR tortiously interfered with the 1998 Agreement and the 2013 Settlement Agreement appears to be that the FoQAR was a mere "shadow corporation of DNCR through which certain upper level employees of DNCR sought to profit from contracts, books, tours, personal promotion, etc., connected to the *QAR* Project." Under this theory, plaintiff claims that certain DNCR employees (dual hat employees) with "specific responsibility for oversight of *QAR* Project and [plaintiff's] *El Salvador* search permit," "wore dual hats" as "officers and agents of DNCR" while also serving as "office[r]s, agents, and directors of . . . FoQAR." Therefore, plaintiff asserts that any action that the dual hat employees took in their capacities at DNCR (1) was the result of a "conflict of interest" and an "unethical relationship[ ]"; and (2) was also imputed to FoQAR. Plaintiff's complaint appears to attempt to support the imputation theory by invoking the doctrine of respondeat superior. However, neither plaintiff's complaint, nor its briefs filed in this Court, cite any authority to support its application of that doctrine to these facts.

We conclude that the trial court correctly determined that "[m]ere allegations that DNCR employees also served as members of F[o]QAR's board of directors" do not amount to allegations that FoQAR intentionally induced DNCR to not perform its obligations under either the 1998 Agreement or the 2013 Settlement Agreement.

Specifically, plaintiff has alleged that the dual hat employees (1) had "specific

responsibility for oversight of *QAR* Project and [plaintiff's] *El Salvador* search permit," (2) were serving as employees of DNCR and FoQAR under a "conflict of interest" and an "unethical relationship[ ]," and (3) were conspiring "with FoQAR to violate multiple provisions of the *QAR* Settlement Agreement." However, plaintiff has not alleged how the dual hat employees intentionally used their positions to induce DNCR to breach either the 1998 Agreement or the 2013 Settlement Agreement. *See Beverage Sys. of the Carolinas, LLC,* 368 N.C. at 700, 784 S.E.2d at 462 (citing *United Labs., Inc.,* 322 N.C. at 661, 370 S.E.2d at 387). We are persuaded that plaintiff's allegations show, at most, that the dual hat employees "induced themselves to breach the 1998 Agreement and [2013] Settlement Agreement."

In addition to its overarching shadow corporation theory, plaintiff alleged that FoQAR tortiously interfered with the 1998 Agreement when, in mid-2013, FoQAR agreed to pay third party companies to produce "various materials, including videos and a website" about the *QAR* Project. Plaintiff also alleged that some of the payment pursuant to the agreement went to the spouse of a dual hat employee. However, these allegations—involving an agreement between FoQAR and third parties, which did not include DNCR—are devoid of any conduct by FoQAR that "intentionally induce[d]" *DNCR* to not perform on its contract with plaintiff. *Beverage Sys. of the Carolinas, LLC,* 368 N.C. at 700, 784 S.E.2d at 462 (quoting *United Labs., Inc.,* 322 N.C. at 661, 370 S.E.2d at 387).

Moreover, plaintiff alleged that FoQAR tortiously interfered with the 2013

Agreement by: (1) contracting with an independent media company to film *QAR* recovery operations and posting the footage on the FoQAR Facebook page without a time code stamp, watermark, or website link; and (2) bringing the crew of a local radio show to dive the *QAR* shipwreck and shoot footage from aboard the recovery vessel. As with the allegations addressed above, plaintiff's allegations here—involving agreements with third parties other than DNCR, and involving FoQAR's own conduct in posting footage of the recovery operation to its own Facebook page—fail to mention any conduct by FoQAR that intentionally induced *DNCR* to not perform on its contract with plaintiff.

Accordingly, we affirm the decision of the trial court to dismiss plaintiff's tortious interference with contract claim.

D. <u>Breach of Contract: *QAR* Media Rights Under the 2013 Settlement Agreement</u>

The trial court dismissed for lack of subject matter jurisdiction plaintiff's claim that DNCR breached the 2013 Settlement Agreement by violating plaintiff's *QAR* media rights. Specifically, the trial court concluded that plaintiff (1) failed to exhaust administrative remedies; and (2) did not allege that administrative exhaustion would be futile. The trial court reached this conclusion because plaintiff dismissed its second petition for a contested case hearing under the North Carolina Administrative Procedure Act (the APA) and then filed a breach of contract claim in superior court without a final decision by the OAH. We reverse.

Our analysis of whether a plaintiff may bring a breach of contract claim against

a State agency in superior court begins with our holding in *Smith v. State* "that whenever the State of North Carolina, through its authorized officers and agencies, enters into a valid contract, the State implicitly consents to be sued for damages on the contract in the event it breaches the contract[,]" and accordingly, the State cannot invoke the doctrine of sovereign immunity as a defense. 289 N.C. 303, 320, 222 S.E.2d 412, 423–24 (1976).

We later concluded, however, that the holding in *Smith* was "superfluous" where "statutory provisions . . . permit an aggrieved party, *after exhausting certain administrative remedies*, to institute a civil contract action in Superior Court." *Middlesex Const. Corp. v. State ex rel. State Art Museum Bldg. Comm'n*, 307 N.C. 569, 573–74, 299 S.E.2d 640, 643 (1983) (emphasis added). In *Middlesex*, we ultimately held that the superior court lacked subject matter jurisdiction to adjudicate plaintiff's breach of contract claims arising from its construction contract with the State in the first instance. *Id.* at 575, 299 S.E.2d at 644. We reasoned that the plaintiff was ultimately required to pursue its claims under the provisions of N.C.G.S. § 143-135.3, which provided the requisite procedure "[w]hen a claim arises prior to the completion of any contract for construction or repair work awarded by any State board to any contractor under the provisions of this Article." *Id.* at 571, 299 S.E.2d at 641 (quoting N.C.G.S. § 143-135.3 (Supp. 1981)). In support of this reasoning, we determined that the language of N.C.G.S. § 143-135.3

> could not be clearer: although a contractor may ultimately

> file an action in Superior Court, the exhaustion of administrative remedies as provided [by the statute] is a *condition precedent* to such action, and the provisions become *a part of every contract* entered into between the State and the contractor.

*Id.* at 573, 299 S.E.2d at 642.

The State Defendants rely on our decision in *Middlesex*, along with our decision in *Abrons Family Practice and Urgent Care, PA v. N.C. Dep't of Health and Human Servs.*, 370 N.C. 443, 810 S.E.2d 224 (2018), in arguing that the trial court was correct to dismiss plaintiff's claim because plaintiff failed to exhaust administrative remedies. The State Defendants argue that the APA provided plaintiff with an administrative remedy here under N.C.G.S. § 150B-23(a). The State Defendants' argument is unavailing.

First, we note that our decision in *Middlesex* does not support the conclusion that plaintiff was required to exhaust any administrative remedy under N.C.G.S. § 150B-23(a) before filing a common law breach of contract claim in superior court. As an initial matter—and unlike the relevant statute in *Middlesex*—N.C.G.S. § 150B-23(a) provides no administrative procedure which specifically applies to plaintiff's contract claim. *Compare* N.C.G.S. § 150B-23(a) (2017), *with* N.C.G.S. § 143-135.3 (Supp. 1981) (specifically creating an administrative procedure for "[w]hen a claim arises prior to the completion of any contract for construction or repair work awarded by any State board to any contractor under the provisions of this Article"). Accordingly—and also unlike the relevant statute in *Middlesex*—neither N.C.G.S. §

150B-23(a) nor our decision in *Smith* explicitly make any specific administrative procedure a "condition precedent" to bringing a contract claim in superior court. *Compare* N.C.G.S. § 150B-23(a) (2017), *with* N.C.G.S. § 143-135.3 (Supp. 1981) (specifically stating that following the administrative procedure set forth in the statute "shall be a condition precedent" to filing suit in superior court). Additionally— and also unlike the relevant statute in *Middlesex*—N.C.G.S. § 150B-23(a) does not explicitly make a specific administrative procedure part of every contract entered into between the State and a private citizen. *Compare* N.C.G.S. § 150B-23(a) (2017), *with* N.C.G.S. § 143-135.3 (Supp. 1981) (specifically stating that the administrative procedure "shall . . . form a part of every contract entered into between any board of the State and any contractor"). Accordingly, N.C.G.S. § 150B-23(a) does not disturb the superior court's "*original general* jurisdiction of *all* justiciable matters of a civil nature."[4] N.C.G.S. § 7A-240 (2017) (emphasis added). We decline to read N.C.G.S. § 150B-23 as creating a specific requirement for the exhaustion of administrative remedies. Accordingly, in the absence of a specific statutory exhaustion requirement,

[4] Under the General Statutes, it is the General Court of Justice—not an "independent, *quasi-judicial agency*" such as the OAH, N.C.G.S. § 7A-750 (2017) (emphasis added)—which is presumed to have "general jurisdiction" over "matters of a civil nature." N.C.G.S. § 7A-240; *see also Reaves v. Earle-Chesterfield Mill Co.*, 216 N.C. 462, 465, 5 S.E.2d 305, 306 (1939) (concluding that an "administrative [body], with quasi-judicial functions," and with "special or limited jurisdiction created by statute[,]" is not a court of general jurisdiction and its jurisdiction can be "enlarged or extended only by the power creating the court." (citations omitted)).

DNCR acknowledged this state of the law in its motion to dismiss plaintiff's second petition for a contested case.

we affirm our holding in *Smith* that, generally, where the State enters into a contract, it consents to be sued in the event of a breach of the contract.

Moreover, the text of the 2013 Settlement Agreement does not make the exhaustion of a specific administrative procedure a condition precedent to filing a breach of contract claim in superior court, nor does it provide a specific procedure for settling disputes under the contract. The only provision in the 2013 Settlement Agreement concerning breach provides that, "[i]n the event D[N]CR, [plaintiff], or Nautilus breaches this Agreement, D[N]CR, [plaintiff], or Nautilus may avail themselves of all remedies provided by law or equity."

Accordingly, here—unlike in *Middlesex*—plaintiff's ability to bring a common law breach of contract claim in superior court was not restricted by any statutory or contractual provision. As a result, the State Defendants cannot rely on *Middlesex* for the proposition that plaintiff was barred from bringing its claim in superior court in the first instance. *See Middlesex*, 307 N.C. at 570, 229 S.E.2d at 641.

The State Defendants' reliance on *Abrons* is also misplaced. In *Abrons*, plaintiffs—all of whom were health care providers—filed suit against the North Carolina Department of Health and Human Services (DHHS), and Computer Sciences Corporation (CSC). *Abrons*, 370 N.C. at 444–45, 810 S.E.2d at 226. DHHS entered into a contract with CSC to develop a new Medicaid Management Information System (later named NCTracks). *Id.* at 445, 810 S.E.2d at 226. After the system went live, plaintiffs began submitting claims to DHHS for Medicaid

reimbursements. *Id.* at 445, 810 S.E.2d at 226. However, "[i]n the first few months of being in operation, [the system] experienced over 3,200 software errors, resulting in delayed, incorrectly paid, or unpaid reimbursements to plaintiffs." *Id.* As a result, plaintiffs filed claims—including claims for monetary damages—alleging "that CSC was negligent in its design and implementation of [the system] and that DHHS breached its contracts with each of the plaintiffs by failing to pay Medicaid reimbursements." *Id.* Further, plaintiffs alleged that "they had a contractual right to receive payment for reimbursement claims and that this was 'a property right that could not be taken without just compensation.' " *Id.* Moreover, plaintiffs "sought a declaratory judgment that the methodology for payment of Medicaid reimbursement claims established by DHHS violated Medicaid reimbursement rules." *Id.*

After receiving adverse determinations on their reimbursement claims, plaintiffs failed to request a reconsideration review or file a petition for a contested case, as specifically required by DHHS procedures. *Abrons*, 370 N.C. at 448, 810 S.E.2d at 228; *see also id.* at 446–47, 810 S.E.2d at 227–28 (discussing DHHS regulations and provisions of the APA which specifically require Medicaid providers to request a reconsideration review and file a petition for a contested case hearing before obtaining judicial review). As a result, we held that the trial court correctly dismissed plaintiffs' claims because they failed to exhaust their administrative remedies and failed to demonstrate that such exhaustion would be futile. *Id.* at 453, 810 S.E.2d at 232.

Here, plaintiff has filed a claim against the State Defendants for their alleged violations of plaintiff's media rights under the 2013 Settlement Agreement. Unlike the relevant claims in *Abrons,* this claim is exclusively one for common law breach of contract and, therefore, it is not a mere "insertion of a prayer for monetary damages" into what is otherwise a claim that is primarily administrative. *See id.* at 452, 810 S.E.2d at 231.

Because plaintiffs' claim here is a common law breach of contract claim, and the State Defendants have failed to demonstrate that this case is governed by our holdings in either *Middlesex* or *Abrons*, or any other provision requiring plaintiff to exhaust administrative procedures, we conclude that plaintiff was not required to exhaust administrative remedies before bringing its breach of contract claim in superior court.

Our conclusion that the trial court had subject matter jurisdiction over plaintiff's claim is supported by the APA. Specifically, the APA provides that "[n]othing in this Chapter shall prevent any party or person aggrieved from invoking *any judicial remedy available to the party or person aggrieved under the law* to test the validity of *any administrative action not made reviewable under this Article.*" N.C.G.S. § 150B-43 (2017) (emphases added); *see also Pachas v. N.C. Dep't of Health & Human Servs.*, 822 S.E.2d 847, 855 (N.C. 2019).

Here, the relevant judicial remedy available to plaintiff is a common law breach of contract claim. As addressed above, we reject the State Defendants'

argument that the APA makes such a common law claim reviewable through the administrative process under N.C.G.S. § 150B-23(a)—which provides the procedure for commencing a contested case.

As a result, the trial court erred in concluding that it lacked subject matter jurisdiction over plaintiff's claim. Because the trial court had jurisdiction to adjudicate plaintiff's claim, plaintiff need not have demonstrated that exhaustion of administrative remedies would be futile. *See Pachas*, 822 S.E.2d at 857 ("Because we conclude that the trial court had jurisdiction over petitioner's motion and petition, we need not determine whether exhaustion of administrative remedies was inadequate or futile here."). Accordingly, we reverse the trial court's conclusion that it lacked subject matter jurisdiction over plaintiff's claim.

E.  Breach of Contract: *El Salvador* Permit

The trial court dismissed plaintiff's breach of contract claim based on DNCR's failure to renew the *El Salvador* permit because it concluded that the claim was barred by the trial court's 20 February 2017 order under "the doctrine of res judicata"[5]

---

[5] Even though the trial court's order discussed "the doctrine of collateral estoppel, or issue preclusion" at some length, it ultimately concluded only that plaintiff's breach of contract claim as to the *El Salvador* permit was "barred by the doctrine of res judicata." Accordingly, of the two doctrines, we will address only whether plaintiff's claim is barred by the doctrine of res judicata. These two doctrines, although historically recognized "as species of a broader category of 'estoppel by judgment,'" are not interchangeable. *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004) (quoting *Bockweg v. Anderson*, 333 N.C. 486, 491–92, 428 S.E.2d 157, 161 (1993)). Specifically, res judicata, or claim preclusion, functions to bar a plaintiff's entire "*cause of action,*" whereas collateral estoppel, or issue preclusion, bars only "the subsequent adjudication of *a previously determined issue*, even if the subsequent action is based on an entirely different claim." *Id.* at 15, 591 S.E.2d at 880

because "[p]laintiff's breach of contract claim was raised in the contested case proceeding" that ultimately reached the trial court on judicial review, and the order constituted "a final adjudication on the merits in the administrative matter." We reverse.

As an initial matter, "[t]he fact that the original claim arose in a quasi-judicial administrative hearing" does not preclude the applicability of res judicata. *See Batch v. Town of Chapel Hill*, 326 N.C. 1, 14–15, 387 S.E.2d 655, 664 (1990). "Under the doctrine of res judicata or 'claim preclusion,' a final judgment on the merits in one action precludes a second suit based on the same cause of action between the same parties or their privies." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004) (quoting *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 413, 474 S.E.2d 127, 128 (1996); *Hales v. North Carolina Ins. Guar. Ass'n*, 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994)). Further, "[t]he doctrine prevents the relitigation of 'all matters . . . that were or should have been adjudicated in the prior action.' " *Id.* at 15, 591 S.E.2d at 880 (quoting *Thomas M. McInnis & Assocs. v. Hall*, 318 N.C. 421, 428, 349 S.E.2d 552, 556 (1986)). However, neither *Whitacre* nor *McInnis* provide guidance on what "matters," are considered to be barred by a prior action. *See id.* at 15, 591 S.E.2d at 880 (ultimately applying the separate doctrine of judicial estoppel); *see also*

---

(emphases added) (citing *Hales v. North Carolina Ins. Guar. Ass'n*, 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994)). Therefore, although "[t]he two doctrines are complimentary," they are not the same. *Id.* at 15–16, 591 S.E.2d at 880.

*McInnis*, 318 N.C. at 428, 349 S.E.2d at 556 (holding that the doctrine of res judicata was inapplicable in that action).

Our decision in *Bockweg v. Anderson*, 333 N.C. 486, 428 S.E.2d 157 (1993), provides guidance on what matters are barred by res judicata. Specifically, in *Bockweg*, we stated that "[w]hile it is true that a 'judgment is conclusive as to all issues raised by the pleadings,' . . . the judgment is not conclusive as to issues not raised by the pleadings which serve as the basis for the judgment." *Bockweg*, 333 N.C. at 492, 428 S.E.2d at 161–62 (citation omitted). In *Tyler v. Capehart*, we stated that a

> judgment is decisive of the points raised by the pleadings, or which might properly be predicated upon them. . . .[but] does not embrace any matters which might have been brought into the litigation, or any causes of action which the plaintiff might have joined, but which in fact are neither joined nor embraced by the pleadings.

125 N.C. 64, 70, 34 S.E. 108, 109 (1899).

Here, there is no dispute that the trial court's order was (1) "a final judgment"[6];

---

[6] Plaintiff does argue, without citing to authority, that the trial court's order was somehow a "deferral" to DNCR's decision to deny the *El Salvador* permit and, therefore, the order was not a final judgment. However, this argument is without merit because the order specifically granted summary judgment in the State Defendants' favor, while denying and dismissing plaintiff's petition. Therefore, the trial court's order constitutes a final judgment. *See Veazey v. City of Durham*, 231 N.C. 357, 361–62, 57 S.E.2d 377, 381 (1950) ("A final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court." (citing *Sanders v. May*, 173 N.C. 47, 49, 91 S.E. 526, 527 (1917); *Bunker v. Bunker*, 140 N.C. 18, 22–24, 52 S.E. 237, 238–39 (1905); *McLaurin v. McLaurin*, 106 N.C. 331, 335, 10 S.E. 1056, 1057 (1890); *Flemming v. Roberts*, 84 N.C. 532, 538–39 (1881)).

and (2) that the final judgment was "between the same parties or their privies." *Whitacre*, 358 N.C. at 15, 591 S.E.2d at 880. The issues are whether the final judgment was "on the merits" and whether that judgment concerned the "same cause of action"—namely plaintiff's breach of contract claim arising from DNCR's denial of plaintiff's permit to search for *El Salvador*. *Bockweg*, 333 N.C. at 492–93, 428 S.E.2d at 162 (citing and quoting *Tyler,* 125 N.C. at 70, 34 S.E. at 109).

We conclude that the trial court's order was not a final judgment on the merits of plaintiff's breach of contract claim because that claim is a separate cause of action which was not raised by plaintiff's pleadings before the trial court, and which cannot be "properly predicated upon [those pleadings]." *Bockweg,* 333 N.C. at 492–93, 428 S.E.2d at 162 (citing *Tyler*, 125 N.C. at 70, 34 S.E. at 109). Specifically, in its petition for judicial review, plaintiff only ever asserted that DNCR was "contractually bound," to continue renewing the *El Salvador* permit in support of plaintiff's argument that the OAH's final agency decision affirming the denial of the permit was "in violation of constitutional provisions, in excess of the statutory authority or jurisdiction of the agency or the administrative law judge, made upon unlawful procedure, affected by other error of law, unsupported by substantial evidence and is arbitrary, capricious and is an abuse of discretion." In this vein, plaintiff asserted that "[DNCR] had previously entered into an agreement with [plaintiff], known as the [2013] Settlement Agreement, in which [DNCR] bound itself to continue renewing [the *El Salvador* permit] 'through the year in which the *QAR* archaeology recovery phase is declared

complete so long as the requirements contained in [the *El Salvador* permit] are fulfilled.' "

Further, nowhere in plaintiff's petition for judicial review did it make the following necessary allegations for a breach of contract claim: "[(1)] the existence of a contract between plaintiff and defendant,  [(2)] the specific provisions breached, [(3)] the facts constituting the breach, and [(4)] the amount of damages resulting to plaintiff from such breach." *RGK, Inc. v. U.S. Fid. & Guar. Co.*, 292 N.C. 668, 675, 235 S.E.2d 234, 238 (1977) (quoting *Cantrell v. Woodhill Enterprises, Inc.*, 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968)). Even assuming—without deciding—that plaintiff's aforementioned assertions were allegations concerning the existence of the 2013 Settlement Agreement, as well as the specific provision of the contract at issue, plaintiff's petition for judicial review still failed to sufficiently allege that the denial of the permit constituted a breach of the 2013 Settlement Agreement, and failed to allege an amount of damages. Therefore, the pleading before the trial court did not raise plaintiff's breach of contract claim, and plaintiff could not have "properly predicate[d]" a breach of contract claim upon that pleading. *Bockweg*, 333 N.C. at 493, 428 S.E.2d at 162 (citation omitted). Accordingly, the trial court erred in dismissing plaintiff's breach of contract claim based on DNCR's failure to renew the *El Salvador* permit through the doctrine of res judicata.

The State Defendants argue to the contrary, stating that our prior decision in *Batch* is controlling here and requires the Court to conclude that plaintiff's claim was

barred by res judicata. Because *Batch* is distinguishable from this case, we do not agree. In *Batch*, a property owner submitted an application to subdivide her property to the Town of Chapel Hill. *Batch*, 326 N.C. at 4, 387 S.E.2d at 657. In its ultimate resolution concerning the property owner's subdivision application, the planning board denied the application on the grounds that the subdivision application was not consistent with several aspects of the town's development ordinance. *Id.* at 7–8, 387 S.E.2d at 659–60. After the planning board denied her application, the property owner filed a "combined complaint and petition for writ of certiorari" in Superior Court, Orange County. *Id.* at 8, 387 S.E.2d at 660. The trial court determined that the claims were properly joined and issued the writ of certiorari. *Id.* at 8, 387 S.E.2d at 660. After that, the property owner moved for summary judgment and the trial court ordered the town to approve the property owner's preliminary plat with a minor exception. *See id.* at 10, 387 S.E.2d at 661.

On appeal, this Court first held that the trial court erred in joining the proceedings pursuant to the writ of certiorari and the complaint. *Batch*, 326 N.C. at 11, 387 S.E.2d at 661–62. Even though we determined that it was error to join the two proceedings, we did not remand the entire case on that basis but, instead, addressed the remaining issues. *Id.* at 11, 387 S.E.2d at 662. In reviewing the issues raised pursuant to the property owner's petition for writ of certiorari, we held, in pertinent part, that "the Town Council properly denied [the property owner's] petition for approval of her subdivision," and, accordingly, we reversed the decision of the

Court of Appeals. *Id.* at 13, 387 S.E.2d at 663. In reviewing the issues raised by the property owner's complaint, we determined that (1) "summary judgment should have been entered for the [town]"; and (2) "[the property owner's] complaint should be dismissed." *Id.* at 14, 387 S.E.2d at 663–64.

The basis for the Court's conclusions that summary judgment should have been granted in favor of the town, pursuant to the property owner's complaint, and that the property owner's complaint should be dismissed, was that "[i]t having been determined *in this opinion* that the Town Council of Chapel Hill properly denied approval of [the property owner's] subdivision plan," *Batch*, 326 N.C. at 14, 387 S.E.2d at 663 (emphasis added), under the issues raised by the petition for writ of certiorari, "[t]he foundation of [the property owner's] alleged causes of action [in her complaint] [was] determined against her," *id.* at 14, 387 S.E.2d at 663–64.

In describing how the Court's holdings on the issues raised by the petition for writ of certiorari *resolved* the issues raised by the complaint, we discussed the doctrine of res judicata. *Batch*, 326 N.C. at 14, 387 S.E.2d at 663–64 (concluding that it was unnecessary to review "any of [the property owner's] constitutional claims or other issues arising upon her complaint" because they were "based solely upon the alleged improper refusal by the Town Council to approve her subdivision plans"). Specifically, we determined that our holding under the issues raised by the property owner's petition for writ of certiorari—that "the Town Council properly denied [the property owner's] petition for approval of her subdivision"—barred, within the same

opinion, any conclusion that she was entitled to summary judgment on the constitutional statutory claims raised by her complaint. *See id.* at 13–14, 387 S.E.2d at 663–64. As such, our application of res judicata in *Batch* resulted from a complex, fact-specific, procedural posture that is not applicable to the facts here.

Accordingly, we reverse the trial court's conclusion that plaintiff's breach of contract claim based upon the State Defendants' refusal to renew the *El Salvador* permit was barred by res judicata.

Conclusion

For the above reasons, we conclude that the trial court (1) properly dismissed plaintiff's breach of contract claims against the State Defendants which arose from the 1998 Agreement; (2) properly dismissed plaintiff's tortious interference with contract claim against FoQAR; (3) erred in dismissing plaintiff's breach of contract claim against the State Defendants concerning its *QAR* media rights under the 2013 Settlement Agreement for lack of subject matter jurisdiction; and (4) erred in dismissing plaintiff's breach of contract claim against the State Defendants arising from DNCR's failure to renew plaintiff's *El Salvador* permit. Accordingly, we affirm in part, reverse in part, and remand to the trial court for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Justice MORGAN concurring in part and dissenting in part.

While I fully concur with my learned colleagues of the majority with respect to plaintiff's claims for breach of the 1998 Agreement, breach of the contractual provisions relating to media rights contained in the 2013 Settlement Agreement, and tortious interference with contract, I respectfully dissent from their determination that the Business Court erred in concluding that plaintiff's breach of contract claim arising from DNCR's refusal to renew plaintiff's permit to search for the shipwreck remains of the *El Salvador* was barred by the doctrine of res judicata. In my view, our longstanding precedent regarding claim preclusion in conjunction with the record on appeal in this matter indicates that this principle applies to plaintiff's *El Salvador* claim. Accordingly, I would affirm the Business Court on this issue.

As noted in the majority opinion, the 2013 Agreement provided that DNCR would

> continue to issue to Intersal an exploration and recovery permit for the shipwreck *El Salvador* . . . . through the year in which the *QAR* [*Queen Anne's Revenge*] archaeology recovery phase is declared complete so long as the requirements contained in the permit are fulfilled. Subject to the provisions of Article 3 of Chapter 121 of the North Carolina General Statutes . . . and the North Carolina Administrative Code, [DNCR] agrees to recognize lntersal's efforts and participation in the *QAR* [P]roject as sufficient to satisfy any performance requirements associated with annual renewal of Intersal's permit for the *El Salvador*.

In sum, to the extent that it would be consistent with our General Statutes and the North Carolina Administrative Code, plaintiff's work on the QAR project would be deemed to "satisfy any performance requirements" for renewal of the *El Salvador* permit. However, when plaintiff applied for a renewal of the permit in 2015, the application was denied. DNCR gave two reasons for the denial: 1) plaintiff's failure "to fulfill material requirements set forth in" the *El Salvador* permit and 2) that renewal was "not deemed to be in the best interest of the State" due to its receipt of a letter dated 30 November 2015 from the Kingdom of Spain which "expressed [the Kingdom of Spain's] intent on maintaining control of the shipwreck and cargo of the *El Salvador* and asserted its position to defend its title," along with stressing Spain's claim that the State of North Carolina lacked the authority to issue a permit to recover the *El Salvador*. Plaintiff believed that this refusal to renew the permit violated the terms of the 2013 Settlement Agreement as quoted above.

As a result of, *inter alia*, DNCR's refusal to renew the permit to search for the *El Salvador*, plaintiff filed a petition for a contested case hearing in the Office of Administrative Hearings (OAH), seeking to compel DNCR to renew the permit.[1] The majority recognizes this development in its opinion in stating that plaintiff had

---

[1] The contested case filing in 15DCR09742 is not part of the record on appeal, but plaintiff's assertion in the OAH that DNCR was "contractually bound" to issue the permit renewal is referenced in decisions issued by the Administrative Law Judge (ALJ), the superior court which undertook the judicial review of the final agency decision, and the Business Court.

"asserted that DNCR was 'contractually bound' to continue renewing the *El Salvador* permit" under terms of the 2013 Settlement Agreement and had failed to do so.

DNCR moved to dismiss the contested case. In a "Final Decision Order of Dismissal" dated 27 May 2016, the ALJ assigned to the contested case by the OAH did not address DNCR's subject matter jurisdiction argument. Instead, the ALJ resolved the contested case upon the finding, *inter alia*, that plaintiff "failed to allege that it had permission from the Kingdom of Spain to engage in the exploration and recovery of the historic shipwreck site of the *El Salvador*," citing the November 2015 letter from the Kingdom of Spain and, among other authorities, *Sea Hunt v. Unidentified Shipwrecked Vessel*, 221 F.3d 634, 640–41 (4th Cir. 2000) (stating "that a shipwreck is abandoned only where the owner has relinquished ownership rights. . . . [and w]hen an owner comes before the court to assert his rights, relinquishment would be hard, if not impossible, to show") (citing 43 U.S.C. § 2101(b)). As a result, the ALJ granted DNCR's motion to dismiss the contested case for failure to state a claim upon which relief can be granted. *See* N.C.G.S. § 1A-1, Rule 12(b)(6) (2017).

Pursuant to N.C.G.S. § 150B-45, plaintiff sought judicial review of the OAH final decision, asserting that "continued renewal of [the *El Salvador* permit] is required by the terms of the QAR Settlement Agreement (2013)" and that DNCR "refused to renew [the *El Salvador* permit] on November 1, 2015, giving rise to this contested case." In its petition for judicial review, plaintiff further alleged:

> The ALJ ignored several additional Petitioner's arguments raised in briefs, exhibits and oral arguments, including, without limitation, that . . . [DNCR] is contractually bound by the [2013] Settlement Agreement to continue renewing [the *El Salvador* permit] "through the year in which the QAR archaeology recovery phase is declared complete so long as the requirements contained in [the *El Salvador* permit] are fulfilled."

The matter was heard in the Superior Court, Wake County. In an order entered 7 November 2016, the superior court noted that the ALJ had determined a broader issue than that presented in plaintiff's petition for a contested case hearing, in that the ALJ purported to resolve the ownership of the *El Salvador*, while the actual issue raised by plaintiff's OAH contested case petition was whether or not DNCR's asserted reason for its denial of the permit renewal—that it would not be in the best interest of the State of North Carolina to issue such a permit given the assertion of ownership by the Kingdom of Spain—was arbitrary or capricious, as plaintiff had couched the administrative controversy in those terms in its OAH petition. However, the superior court determined that remand to the OAH was not necessary despite this error, because the North Carolina General Statutes provide that "[i]n reviewing a final decision allowing judgment on the pleadings or summary judgment, the court may enter any order allowed by G.S. 1A-1, Rule 12(c) or Rule 56." N.C.G.S. § 150B-51(d) (2017). In its order, the superior court then 1) determined that the record in the matter was fully developed and all issues were thoroughly briefed, such that it could resolve defendant's motion for summary judgment which was filed

in the alternative to its motion to dismiss on the pleadings and 2) held that the denial of the *El Salvador* permit renewal was not arbitrary and capricious, but instead was in the best interest of the State in light of the ownership assertion of the Kingdom of Spain. With this analysis, the superior court affirmed OAH's dismissal of the contested case. Plaintiff did not appeal from this determination.

However, in the subsequent civil suit which was brought before the Business Court and which this Court has now been engaged to address, plaintiff pursued a breach of contract claim, contending that defendants breached the 2013 Settlement Agreement when defendants denied the plaintiff's request for the renewal of the *El Salvador* permit in 2015. The Business Court viewed this claim as barred by the operation of the doctrine of res judicata, holding that the superior court's "[o]rder was a final adjudication on the merits in the administrative matter" and that "[p]laintiff's breach of contract claim was raised in the contested case proceeding."

As the majority decision correctly notes,

> Under the doctrine of res judicata or "claim preclusion," a final judgment on the merits in one action precludes a second suit based on the same cause of action between the same parties or their privies. *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 413, 474 S.E.2d 127, 128 (1996); *Hales v. North Carolina Ins. Guar. Ass'n*, 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994). The doctrine prevents the relitigation of "all matters . . . that *were or should have been adjudicated* in the prior action." [*Thomas M.*] *McInnis* [*& Assocs. v. Hall*], 318 N.C. [421,] 428, 349 S.E.2d [552,] 556 [(1986)].

*Whitacre P'ship v. BioSignia, Inc.*, 358 N.C. 1, 15, 591 S.E.2d 870, 880 (2004) (emphasis added; first alteration in original); *see also Bockweg v. Anderson*, 333 N.C. 486, 492, 428 S.E.2d 157, 161 (1993) (holding that a judgment is conclusive on all issues raised by the pleadings). In *Bockweg*, we further explored the doctrine's application in observing that "subsequent actions which attempt to proceed by asserting a new legal theory or by seeking a different remedy are prohibited under the principles of res judicata." 333 N.C. at 494, 428 S.E.2d at 163 (addressing a case in which the "[p]laintiffs did not merely change their legal theory or seek a different remedy. . . . [but r]ather, [were] seeking a remedy for a separate and distinct negligent act leading to a separate and distinct injury").

The disputed question in the present case is whether the pertinent claim—breach of the *El Salvador* permit renewal provision of the 2013 Settlement Agreement—was "or should have been adjudicated in the" OAH proceeding that concluded with the superior court order dismissing plaintiff's petition; if so, then it cannot be revisited in this case. In the view of the majority, the well-established principle of res judicata or claim preclusion does not apply here to bar plaintiff from re-litigating the question of whether DNCR breached the 2013 Settlement Agreement by failing to renew the *El Salvador* permit, based upon the majority's deductive reasoning that the breach of contract claim "was never considered" because the superior court's order did not expressly address the issue, but instead focused upon the alternative basis for plaintiff's challenge of the permit denial by defendants

regarding the superior court's determination that the renewal of the permit was not in the best interest of the State. Further, although the majority acknowledges that in the OAH proceeding plaintiff "asserted that DNCR was 'contractually bound' to continue renewing the *El Salvador* permit," my colleagues with the majority view take the position that plaintiff did not make allegations to support a breach of contract claim in its petition for judicial review and therefore conclude that "the pleading before [the superior court] did not raise plaintiff's breach of contract claim." The majority also focuses on the concept that plaintiff did not plead an amount of damages—an element of a civil breach of contract claim—and therefore that the OAH could not have awarded monetary damages to plaintiff in the contested case proceeding, in an effort to fortify the rationale for this case outcome. However, the majority misapprehends both our precedent and the procedural posture of the case on this point.

As an initial matter, contrary to the majority's reasoning, plaintiff's petition for judicial review was not a "pleading" as that term is construed in the appellate case law which applies the doctrine of res judicata when discussing what issues were raised and what "matters . . . were or should have been adjudicated in the prior action." *Thomas M. McInnis & Assocs.*, 318 N.C. at 428, 349 S.E.2d at 556. Here, the petition for judicial review which afforded the superior court its jurisdiction is more properly viewed as an appeal document initiating appellate review, instead of a pleading initiating a legal controversy in the first instance. In this regard, the

contested case petition filed in the OAH was the "pleading" for purposes of proper evaluation of the application of res judicata.

More importantly, in the OAH contested case proceeding, plaintiff asserted that the 2013 Settlement Agreement "contractually" bound DNCR to renew the *El Salvador* search permit and that DNCR did not renew said permit. *See Bockweg*, 333 N.C. at 492, 428 S.E.2d at 161 (holding that, generally, a judgment is conclusive on all issues that are raised or could have been raised by the pleadings). However, the fact that plaintiff sought one remedy—renewal of the permit—in the OAH proceeding and a different remedy—money damages—in the civil suit does not remove plaintiff's essential claim—that the contract as evidenced by the 2013 Settlement Agreement was breached—from the bar of res judicata. *See id.* at 494, 428 S.E.2d at 163 ("[S]ubsequent actions which attempt to proceed by asserting a new legal theory or by seeking a different remedy are prohibited under the principles of res judicata"); *see also Cannon v. Durham Cty. Bd. of Elections*, 959 F. Supp. 289, 292 (E.D.N.C.) ("[R]es judicata operates to bar all related claims and thus plaintiffs are not entitled to a separate suit merely by shifting legal theories"), *aff'd,* 129 F.3d 116 (4th Cir. 1997).

In sum, plaintiff had the opportunity to fully argue its contract-based claim regarding DNCR's refusal to renew the permit to search for the *El Salvador* in the OAH proceeding, and the Business Court correctly held that the doctrine of res judicata dictates that plaintiff could not have a second bite at that particular apple

in its civil court action. Accordingly, I dissent from the majority on this issue and would affirm the Business Court regarding it.

Justice ERVIN joins in this separate opinion.